UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES GRABOWSKI,

                    Plaintiff,                              Case No. 1:10-cv-140

v.                                                          HON. JANET T. NEFF

LINCOLN NATIONAL LIFE
INSURANCE COMPANY,

                    Defendant.
_____/

## OPINION

In this benefits case under the Employment Retirement Income Security Act of 1974, 29

U.S.C. § 1001 *et seq*. (ERISA), Plaintiff, James Grabowski, is suing Defendant, the Lincoln Life

National Life Insurance Company (Lincoln), for reinstatement of his long-term disability (LTD)

benefits.  The benefits were paid pursuant to an employee welfare benefit plan (the Plan) under a

policy issued to Grabowski's former employer, Genzink Steel, by Defendant's corporate

predecessor, the Canada Life Assurance Company (Canada Life).  Defendant is now insurer of the

group policy and is acting as the claims administrator, determining eligibility for benefits.  Plaintiff

began receiving LTD benefits in 2000, and Lincoln terminated the benefits in 2008.

The parties have filed cross-motions for judgment on the administrative record (Pl. Mot., Dkt

43; Def. Mot., Dkt 45).  Each party has filed a brief in support of its respective motion (Pl. Dkt 44;

Def. Dkt 47), a response (Pl. Dkt 46; Def. Dkt 52), a Statement of Material Facts (SMF) (Pl. Dkt 50;

Def. Dkt 49), and a response to opposing party's statement of facts (Pl. Dkt 48; Def. Dkt 51).  The

Administrative Record (AR) has also been filed (Dkt 22).

Defendant asserts that its decision to terminate LTD benefits should be assessed and approved under the arbitrary and capricious standard of review. Defendant also claims that Plaintiff failed to exhaust his administrative remedies by failing to make a timely second appeal of his denial of benefits. Plaintiff requests that his LTD benefits be restored because his physical condition has not improved but, instead, has deteriorated, and he remains vocationally disabled. Plaintiff argues that Defendant's termination of benefits decision should be rejected under either the *de novo* or the arbitrary and capricious standard of review and that Defendant's conflict of interest, as both insurer and administrator, should be taken into account. Plaintiff further maintains that the Court should apply the *de novo* standard because the discretionary authority afforded Canada Life did not devolve to Lincoln and because its discretionary clause is void under Michigan law

The Court has carefully considered the parties' briefs and the Administrative Record. For the reasons that follow, the Court concludes that Plaintiff's motion for judgment (Dkt 43) should be granted and Defendant's motion (Dkt 45) denied.

## I. Legal Issues

### A. Exhaustion of Administrative Remedies

Defendant argues that judgment should be entered in its favor because Plaintiff failed to file a timely second appeal (Dkt 47, Def. Mem. in Supp. at 23-24). Plaintiff maintains that a second appeal is not required under the Plan documents, which does not provide for multiple appeals (Dkt 44, Pl. Br. in Supp. at 16-17). The Plan refers in the singular to "a review of the denied claim" and states that "the final decision" will subsequently be issued (AR 93). Lincoln's denial of benefits letter stated: "once all required reviews of your claim have been completed, you have the right to bring a civil action under applicable law" (AR 188). The Plan cannot be construed to require more

than one appeal. *See Huffaker v. Metro. Life Ins. Co.*, 271 Fed. App'x 493, 499 (6th Cir. 2008) (description of process for appeal in singular implies only one appeal). Plaintiff's claim thus will not be dismissed for failure to exhaust administrative remedies.

## B. Standard of Review for ERISA Claim

The standard of review for ERISA claims is well established. "[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). "If, as here, the insurance plan administrator is vested with discretion to interpret the plan, we review the administrator's denial of benefits under the arbitrary and capricious standard." *DeLisle v. Sun Life Assurance Co. of Canada*, 558 F.3d 440, 444 (6th Cir. 2009). "Though highly deferential, this standard nevertheless requires review of the quality and quantity of the medical evidence and the opinions on both sides of the issues.'" *Curry v. Eaton Corp.,* 400 Fed. Appx 51, 57 (6th Cir. 2010) (quoting *McDonald v. W.-S. Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003)). "[M]erely because our review must be deferential does not mean our review must also be inconsequential. While a benefits plan may vest discretion in the plan administrator, the federal courts do not sit in review of the administrator's decisions only for the purpose of rubber stamping those decisions." *Moon v. Unum Provident Corp.*, 405 F.3d 373, 379 (6th Cir. 2005). The court's task is to review the record to determine if the administrator's decision "'is the result of a deliberate, principled reasoning process, and if it is supported by substantial evidence.'" *Glenn v. MetLife*, 461 F.3d 660, 666 (6th Cir. 2006), *aff'd,* 554 U.S. 105 (2008) (quoting *Baker v. United Mine Workers of Am. Health & Ret. Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991)).

### C.  Deferential Standard for Successor

Plaintiff maintains that the Court should apply a *de novo* standard of review because Lincoln is not entitled to the deferential standard of its predecessor (Dkt 44, Pl. Br. in Supp. at 17-18; Dkt 46, Pl. Resp. at 3-9).  The Plan identifies Genzink Steel as the Policyholder and Plan Administrator and Canada Life as the Claims Administrator, the entity who authorizes and makes payment of benefits (AR 91-92).  Claimants are required to give "satisfactory Proof of Disability" to Canada Life for payment of claims and ongoing disability benefits (AR 85-86).  Plaintiff acknowledges that this "satisfactory proof" requirement gave Canada Life, as Claims Administrator, discretion over disability determinations (Dkt 44, Pl. Br. in Supp. at 17).

Plaintiff argues, however, that this discretion was not delegated to Jefferson Pilot Financial Insurance Company (Jefferson), Lincoln's predecessor, because Jefferson acquired less than a 100% ownership of Canada Life, which is still a going concern (*id.* at 17-18; Dkt 46, Pl. Resp. at 3-5). Lincoln counters that Jefferson acquired the Plan in its entirety and all of Canada Life's rights and obligations under the Plan, including its right to make discretionary decisions (Dkt 47, Def. Mem. in Supp. at 11-13).  Lincoln supports its claim with an Affidavit of Business Records and the Assumption Reinsurance Agreement, attached as Exhibit A to its Statement of Facts (Dkt 49, Ex. A).  We will consider this document, although it is not in the Administrative Record, for purposes of deciding the standard of review.  *See Weinkauf v. Unicare Life & Health Ins. Co.,* No 1:09-cv-638, 2010 WL 1839441, at *4 (W. D. Mich. Apr. 23, 2010) (ERISA review guidelines allow consideration of evidence outside administrative record to ascertain appropriate standard of review).

Case law supports Defendant's contention that a successor acquires the discretionary authority conferred by the plan if the successor steps into the shoes of the predecessor.  *See Schnur*

4

*v. CTC Commc'ns Corp. Group Disability Plan*, No. 5 Civ. 3297, 2010 WL 1253481, at \*10 (S.D.N.Y. Mar. 29, 2010); *Hunley v. Hartford Life & Accident Ins. Co.,* 712 F. Supp. 2d 1271, 1281 (M.D. Fla. 2010); *Simonia v. Hartford Ins. Co.*, 606 F. Supp. 2d 1091, 1096-97 (C.D. Cal. 2009), *aff'd,* 378 Fed. App'x 725 (9th Cir. 2010).

Plaintiff's argument that discretion did not devolve (Dkt 46, Pl. Resp. at 5) is unconvincing. In particular, Plaintiff argues that acquisition of 100% ownership of a predecessor is critical, based on a distinction drawn in *Williams v. Hartford Life & Accident Co.,* No. C 2-08-128, 2009 WL 3127761, at \*7 (S.D. Ohio Sept. 25, 2009) in its analysis of *Weidauer v. Broadspire Servs., Inc.,* No. C-3-07-097, 2008 WL 4758691, at \*10 (S.D. Ohio Oct. 27, 2008). A careful review of the *Williams* analysis and the opinion in the underlying *Weidauer* case shows that the critical issue in *Weidauer* was not transfer of 100% of a company's assets but rather the lack of any evidence in the record before the court to support the complex transfers of functions and assets alleged by the defendants. *Williams*, 2009 WL 3127761, at \*7; *Weidauer*, 2008 WL 4758691, at \*10.

Here, Lincoln has offered documentation in support of its position, and the Assumption Reinsurance Agreement provides evidence of transfer of the Plan to Jefferson (Dkt 49, Ex. A, ¶ 3). It specifically provides that Jefferson is "entitled to all the rights owed to [Canada Life], pursuant to the terms and conditions of the policies …" (*id.*, ¶ 3) and that "[Jefferson] shall make all discretionary decisions with respect to the assumed business …" (*id.*, ¶ 4 (g)). As noted above, Plaintiff acknowledges that the "satisfactory proof" language of the Plan grants discretionary authority to the Claims Administrator, and Lincoln shows that it is the successor insurer and Claims Administrator for the Plan.

Plaintiff also argues that discretionary authority did not devolve to Lincoln from Jefferson because it was blocked by Michigan Administrative Code Rule 500.2202 (Dkt 46, Pl. Resp. at 8-9), which provides in pertinent part:

> (a) A discretionary clause unreasonably reduces the risk purported to be assumed in the general coverage of the policy within the meaning of MCL 500.2236(5).
>
> (b) On and after the first day of the first month following the effective date of these rules, an insurer shall not issue, advertise, or deliver to any person in this state a policy, contract, rider, indorsement, certificate, or similar contract document that contains a discretionary clause. This does not apply to a contract document in use before that date, but does apply to any such document revised in any respect on or after that date.
>
> (c) On and after the first day of the first month following the effective date of these rules, a discretionary clause issued or delivered to any person in this state in a policy, contract, rider, indorsement, certificate, or similar contract document is void and of no effect. This does not apply to contract documents in use before that date, but does apply to any such document revised in any respect on or after that date.

Mich. Admin. Code r. 500.2202 (2011). While Defendant (Lincoln)[1] does not dispute that Rule 500.2202 was in effect when, as a result of a corporate merger, it succeeded Jefferson as claims administrator, Defendant insists that the Plan was not amended or revised in any respect by the merger, but that Lincoln simply stepped into the shoes of the Plan administrator under the already established rights and obligations under the Plan (Dkt 52, Def. Reply at 5). Plaintiff provides no evidence that the Plan, in effect before Rule 500.2202 was promulgated, has been revised.

Therefore, we review this case under the highly deferential arbitrary and capricious standard.

### D.  Conflict of Interest

We also consider conflict of interest as a factor to be weighed in determining whether the

---

[1]For ease of reference to the appropriate record, the terms "Defendant" and "Lincoln" are used interchangeably in this opinion, as are the terms "Plaintiff" and "Grabowski."

decision to deny benefits was an abuse of discretion.  *Firestone*, 489 U.S. at 115.  An inherent

conflict of interest exists where, as here, an insurance company determines eligibility for benefits

under an ERISA plan and also pays those benefits.  *Glenn*, 554 U.S. at 114.  While the inherent

conflict of interest does not require the court to conclude that the conflict shaped the insurer's

determination, *Curry*, 400 Fed. App'x at 58-59, the court "looks to see if there is evidence that the

conflict in any way influenced the plan administrators' decision."  *Hunter v. Life Ins. of N. Am.*, No

10-1244, 2011 WL 2566357, at *4 (6th Cir. June 29, 2011).  "We give more weight to the conflict

'where circumstances suggest a higher likelihood that it affected the benefits decision.'"  *DeLisle*,

558 F.3d at 445 (quoting *Glenn*, 554 U.S. at 117).  Courts must consider conflict of interest as one

factor among several in determining whether the plan administrator abused its discretion in denying

benefits.  *Glenn*, 554 U.S. at 117.

## II.  Administrative Record Review

We summarize the pertinent facts here with references to documents in the Administrative

Record (AR).  *See Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 619 (6th Cir. 1998)

(Gilman, J., concurring) (district court review generally limited to administrative record).

Plaintiff was employed by Genzink Steel as a steel fabricator (AR 470-71).  He applied for

disability in April 2000, claiming that neck problems and pain arising from injuries, including an

auto accident in 1998, made him unable to continue his employment as a fabricator (AR 471-74).

Plaintiff's treating physician, Timothy Dickinson, M.D., diagnosed "cervical disc disease/L

paracentral herniated dis[c] C-4+5" in May 2000 (AR 503-05).   Following referral to a

neurosurgeon, Alain Fabi, M.D., Grabowski underwent spinal surgery in July 2000, which included

an anterior cervical discectomy at C-4-C-6 and an iliac crest autograft fusion with plating (AR 497-

99).  The pain radiating into Grabowski's left arm resolved with the surgery, but he continued to

experience pain in his neck and triceps (AR 491), and Dr. Fabi referred him for treatment at a pain

clinic (AR 536).  Multiple visits to the Kalamazoo Anesthesiology Pain Clinic from July through

November 2001 did little to relieve the pain (AR 506-530).

Payment of benefits to a disabled employee under the Genzink Steel Plan requires that the

applicant meets the definition of "Total Disability" and begins after a 90-day Elimination Period

(AR 58).  The definition of disability initially applies to the claimant's "own occupation," but the

definition changes 24 months after the end of the Elimination Period (*id.*).  Thereafter, the standard

is called the "any occupation" standard, and provides (*id.*):

> Totally Disabled and Total Disability mean because of an Injury or Sickness, *all* of
> the following are true:
>
> (a)     You are unable to do the Material and Substantial Duties of any
>         occupation for which You are or may become reasonably qualified
>         by education, training or experience; *and*
>
> (b)     You are receiving Appropriate Evaluation and Treatment from a
>         Physician for that Injury or Sickness; *and*
>
> (c)     Your Work Earnings are less than 20% of Your Indexed Pre-
>         Disability Monthly Earnings.

Plaintiff's LTD benefit was approved to begin on July 24, 2000 (AR 664-65).  For the first

two years of disability, Plaintiff was paid LTD benefits on the basis of disability from his own

occupation (*id.*).  On March 15, 2002, Canada Life initiated its review of Plaintiff's qualification for

continuing benefits under the "any occupation" definition (AR 714).  In the process of its review and

subsequent reconfirmations of Plaintiff's eligibility for benefits, Defendant periodically repeated its

request for updated information and further proof.

8

Plaintiff's treating physician, Dr. Dickinson, communicated much of the medical information in Defendant's file.  On August 15, 2003, Dr.  Dickinson reported a diagnosis of "cervical disc with radiculopathy," with symptoms of "severe neck and radicular pain," and clinical findings of restricted arm elevation [and] arm weakness" (AR 594-95).  Dr. Dickinson  noted that his patient could not tolerate pushing or pulling activities or prolonged sitting or standing (AR 595).  Under "Physical Impairment," Dr. Dickinson checked "Class 4- . . . (sedentary), but added that Grabowski "can do no lifting, pushing, pulling, can't tolerate prolonged sitting or prolonged standing, cannot extend his neck, can't tolerate jarring as with forklift, truck, etc." (*id.*).  "Dr. Dickinson concluded: "It would be an unusual job that would accommodate his limitations and restrictions (*id.*).

Dr. Dickinson's subsequent reports noted Plaintiff's ongoing pain, reiterated the restrictions and limitations quoted above, documented the diagnosis of diabetes and a heart condition, and reported new injuries.  In office notes on September 15, 2003, Dr. Dickinson described Grabowski as, overall, "feeling really quite good," walking, and trying to stay active, but he noted that "he is quite limited" and listed Grabowski's report of "severe neck and upper pain, spasm and throbbing" after mowing with a rider mower, shortness of breath from climbing one flight of steps, and his inability to get dishes from a cupboard above chest level (AR 571).  On December 12, 2003, Dr. Dickinson reported in office notes that Grabowski's neck and shoulder discomfort was "clearly worse" with cold, damp weather, that he needed medication to keep his neck pain under control, and that, when he worked with his hands at a task like vacuuming, he developed severe neck pain for hours to a day afterwards (*id.*).

Plaintiff also suffered medical set-backs.  In July, 2004, he was injured on his bicycle when he was struck by a motor vehicle (AR 673).  In November 2005, he fell from a hunting stand and

9

suffered a compression fracture in his lower back (AR 287).  In April 2006, he was hospitalized for seven days after drinking heavily, falling, and fracturing his ulna at the elbow (AR 286).  He was diagnosed with diabetes while hospitalized (*id.*).  On January 10, 2007, Dr. Dickinson reported that Grabowski was suffering moderate back pain from a slip-and-fall in addition to his chronic neck pain, "dulled by Vicodin, usu[ally] 2 daily" (AR 224).  Dr. Dickinson also reported "sleep is still a problem.  The trazodone helps but still awakens 1-2 times nightly with a pain bolt in the neck" (*id.*) Plaintiff was hospitalized again from December 8 to 12, 2007 (AR 199).  He was admitted for seizures and was in a drug-induced coma for 3 days (*id.*).  Reporting on a December 19, 2007 office visit, Dr. Dickinson stated that Grabowski had been vomiting and drinking lots of water and that the hospital found him severely hyponatremic, with low potassium and very high glucose, and suspected water intoxication *(id.)*.

The December 19, 2007, visit to Dr. Dickinson focused on Grabowski's blood chemistry issues (AR 199-201).  The only medical records that appear in the Administrative Record from that visit to the June 4, 2008, termination of benefits letter (AR 185-91), are office notes from January and February 2008, which focused on testing and improvement of Grabowski's blood sugar and reported his complaints of continued neck pain and resumption of his prescriptions for pain relievers (AR 193-196).

The Administrative Record contains three reports by vocational consultants.[2]  On September 23, 2003, Plaintiff participated in a Functional Capacity Evaluation (FCE) at the Allegan General Hospital (AR 574-75).  The two hour and thirty minute examination determined that he had limited ability to lift, push, pull, stand, or sit (AR 575).  The occupational therapist, Kim Counterman, noted that Plaintiff complained of constant pain that increased with activity and numbness in his hands with use of his arms (AR 574).  She also reported that "patient's fine motor skills were classified as not qualified according to the Purdue Pegboard Assembly test" (*id.*) and that his hand function was limited to "Simple Grasping" (AR 575).

Plaintiff submitted to a second FCE and was tested by Kim Counterman again on August 17, 2005, for three hours and 45 minutes, with similar results (AR 339-48).  Plaintiff again reported that he experienced pain, which increased with activity (AR 343), and he tested below the 1st percentile in fine motor skills (AR 345).  A functional lifting test showed Plaintiff capable of occasionally lifting 10-11 pounds and carrying 13 pounds (AR 346).  Counterman noted that Grabowski

---

[2]There is a reference in the Administrative Record to a fourth vocational assessment dating from 2003.  Plaintiff applied for Social Security Disability Insurance Benefits, which were denied on December 23, 2003 (AR 686-96).  In the Decision, the Administrative Law Judge (ALJ) considered testimony from an individual the ALJ described as a vocational expert, and concluded that Plaintiff had the functional capacity to do a limited range of light work such as machine tender, packer, janitor, assembler, or cashier (AR 693).  The ALJ concurred with the vocational expert's opinion that Plaintiff had no transferable skills to light work, but concluded Plaintiff could make a vocational adjustment to light work (693-94).  The ALJ also noted that someone who can do light work "can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods," but did not make any finding as to whether such limiting factors existed (AR 694).  Lincoln did not refer to this 2003 determination in its 2008 termination of benefits letter or its 2009 letter affirming denial on appeal, but Defendant (Lincoln) mentions it several times in its arguments to this Court as a reason to terminate benefits and erroneously asserts that the ALJ found Grabowski capable of sedentary work (Dkt 47, Def. Mem. in Supp. at 14).  Defendant does not otherwise explain why the ALJ's 2003 opinion is relevant to its 2008 decision.

demonstrated reasonable effort and his report of his abilities was consistent with his performance (AR 347).  She concluded that he was capable of sedentary work, with sitting and standing for no more than 66% of the workday and walking, bending, and reaching 1-33% of the workday (AR 348).

In 2005, Lincoln's predecessor, Jefferson, referred Plaintiff to Adling and Associates, Inc. for a vocational evaluation.  The vocational rehabilitation consultant, Janine Holloman, reviewed Plaintiff's medical records, met with Plaintiff on February 21, 2005, discussed her finding with Defendant, and wrote a detailed report (AR 673-676).  Holloman noted that Grabowski reported ongoing severe neck pain and communicated details about his bicycle accident in 2004, his medication regimen, job history, and job skills (*id.*).  She reported that he had been charged about four years earlier with two misdemeanor counts of domestic violence (AR 674).  Holloman also reported that Plaintiff did not use a computer and had passed typing in high school with a D- grade (AR 675).  She concluded: "The claimant has no transferable skills to light or sedentary occupations" (*id.*).  She also commented on "multiple barriers to vocational rehabilitation," which included the restriction to sedentary work, the lack of a valid driver's licence, and residence in a rural area, and noted that "claimant's medication regimen makes his pain manageable, but has the side affects of drowsiness and difficulty concentrating, which could make retraining difficult" (*id.*).  Defendant's internal note on the consultation identifies "lack of motivation" as one of the barriers to vocational rehabilitation (AR 17), but Holloman did not mention lack of motivation in her written report (AR 673-76).

On May 31, 2006, Jefferson routed Plaintiff's file to "Atlanta Voc" for a vocational review (AR 17).  Internal notes dated June 5, 2006, stated that the Transferable Skills Report it received in response found no occupations for Grabowski at sedentary capacity (AR 5), and a subsequent

internal note regarding Plaintiff's LTD status described him as "vocationally disabled" (AR 4).  A

note entered in Defendant's internal claims file on May 22, 2007, stated that claimant "is capable

of sedentary work, but we could not find him gainful, thus he is vocationally disabled" (AR 3).  The

note explained that he was not a good candidate for vocational rehabilitation because he lacked

education and sedentary skills and lacked motivation (AR 3).  Grabowski was again designated

vocationally disabled on February 12, 2008, in an internal note to his claim file (AR 3) after Lincoln

took over from Jefferson as Claims Administrator (AR 209) and received the medical records it had

requested from Dr. Dickinson on January 31, 2008 (AR 3).

Lincoln's next reported internal activity occurred three weeks before it sent Plaintiff its

notice of termination of benefits.  On May 14, 2008, the file was referred for a Transferable Skills

Report (*id.*)  The Report, dated May 19, 2008, attached a list of six jobs identified as "a sample of

potential jobs that the above individual has the transferable skills, education, training and or

background to perform and meet the gainful amount of $1,457 per month" (AR 190).  On May 21,

2008, Defendant's internal record notes: "gainful occ found at sedentary level.  Will send file for

full med review to see if [claimant] has R[estrictions]/L[imitations]  from Sedentary level" (AR 3).

The next entry, dated June 4, 2008, is entitled "DENIAL RATIONAL" and states (*id.*):

> FCE performed in 2003 and 2005 indicated clmnt [(claimant)] could do sedentary
> level work.   [R]ecent notes do not indicate any significant
> R[estrictions]/L[imitation]s preventing work at sedentary level.  Med review done
> and R[estrictions] /L[imitation]s for sedentary were not supported.  [W]ill pay claim
> to 7/1/08 and close.

The medical review on which Defendant relied to terminate benefits was a file review

conducted in-house by Linda Brandenburg, RN BS (AR 19-20).  She entered her report into

Defendant's computerized reporting system on June 2, 2008, and described the medical review as

13

"limited" (AR 19).  Brandenburg's brief report emphasized portions of Plaintiff's medical records that did not address his pain level or restrictions (AR 19-20).  Her review mentioned the surgery in 2000, cited the 2005 FCE, and identified some of plaintiff's injuries since 2005, but did not mention the 2005 Holloman report or the most recent Attending Physician's Statement in Grabowski's file at the time (*id.*).  In that statement, dated May 10, 2006, Dr. Dickinson identified symptoms of neck pain, restricted range of motion, and spasms (AR 337-38).  While indicating his agreement with the FCE's assessment that Grabowski had the capacity to perform some sedentary occupations by attaching the 2005 FCE report, he qualified Plaintiff's capacity by spelling out, under "Restrictions" that Plaintiff should not "lift, push, pull" and "can neither sit [n]or stand for very long," needs "frequent change of position," and "can't reach above head" (AR 337).  Brandenburg did not acknowledge or explain why she disregarded these restrictions (AR 19-20).

Summarizing Dr. Dickinson's October 4, 2006 notes, Brandenburg highlighted the comment that Grabowski was walking at least one mile twice a day (AR 20), but she did not include any of the other information , which detailed Grabowski's reports of  frequent and severe pain (AR 257).  She reviewed in more detail the medical records from late 2007 and early 2008, which focused on Plaintiff's hospitalization and did not address his capacity for work (AR 20).  Brandenburg concluded that medical documentation did not appear to support restrictions or limitations that preclude work in a sedentary occupation (*id.*)

On June 4, 2008, Lincoln sent Plaintiff a letter announcing that it was terminating benefits as of July 1, 2008, on the grounds that Plaintiff was not limited from working in a sedentary capacity (AR 184-91).  The letter stated that the determination that Plaintiff was capable of working at a sedentary level was based on the 2003 and 2005 FCE's and medical records provided by Dr.

14

Dickinson, Dr. Fabi, and Kalamazoo Anesthesiology (AR 186).  Defendant defined sedentary work as "Sitting for 6 hours out of an 8-hour day and lifting no more than 10" (AR 187).  Explaining that it had used the Dictionary of Occupational Titles (DOT) as a reference, Lincoln listed six occupations it determined that Plaintiff was capable of performing, one of which was "System Surveillance Monitor" and the other five of which were clerical jobs (*id.*)  Lincoln then described the list as "just a sample of various jobs that *you show transferable skills* to perform (*id.*; emphasis added).

Plaintiff filed an appeal of the termination of benefits on October 27, 2008.[3]  Plaintiff's attorney then forwarded medical records, including a report by Dr. Dickinson on June 20, 2008, that plaintiff had restricted neck motion, severe upper trapezius pain, ongoing pain in lower back, and restricted motion of the spine (AR 153)  Dr. Dickinson concluded: "There appears to be no improvement and apparent insidious decline in function.  Has considerable ongoing pain.  I serious[ly] doubt that he will ever be able to get gainful employment in the future" (*id.*).  On September 30, 2008, Dr. Dickinson reported that Grabowski had had an "apparent 'melt-down' and is struggling to get his life back together again" (AR 147).  Dr. Dickinson noted that Plaintiff's range of motion in his neck had decreased, and he concluded, Grabowski "is no better and if anything is feeling worse.  Is in continuous pain and very limited in activities" (*id.*).  Dr. Dickinson's notes on Plaintiff's December 2, 2008, visit reported that Grabowski was putting his life back together but still had constant pain and on-going restrictions of waist extension and neck movements (AR 143-

---

[3] The Administrative Record contains an undated letter of appeal from Plaintiff (AR 155) and letters from Plaintiff's attorney attaching medical records (AR 138-49, 151-54).  Defendant acknowledged receipt of an appeal letter from Plaintiff's attorney (AR 176), but that letter does not appear to be included in the Administrative Record.

45).  Dr. Dickinson concluded that Grabowski's lumbar disc degeneration and cervical impairments were severe and that he was very limited by pain (AR 145).

        As part of the appeal process, Lincoln sent Plaintiff for an Independent Medical Evaluation (IME) with a neurosurgeon, Dr. Carr, D.O. (AR 106).  Dr. Carr examined Plaintiff on January 7, 2009, reviewed his medical records, and reported findings and conclusions (AR 106-15).  Dr. Carr acknowledged Plaintiff's physical impairments of the spine, noting that he had "significant degenerative disease in his cervical spine at virtually all levels" and that this impairment involved "mild to perhaps approximating moderate decrease in range of motion" (AR 114-15).  Dr. Carr discounted Plaintiff's reports of pain, stating, "I believe that his described pain, disability, and range of motion are out of proportion to the physical examination and diagnostic studies" (AR 114).  Dr. Carr opined that Plaintiff was able to work full time at sedentary occupations and added:  "I do not see the need for specific restrictions" (AR 115).  But he qualified his opinion on restrictions by defining occupations in the sedentary category as ones that "would not involve repetitive, frequent, extreme, or prolonged movements of the cervical spine, if any" and adding that Plaintiff "should provide his own personal restrictions to maintain comfort" (*id.*).

        Lincoln denied Plaintiff's appeal in a letter dated February 11, 2009 (AR 101-05).  The letter explained that Plaintiff's claim for LTD benefits "was originally approved from 7/24/2000 to 07/01/2001 as we found your client meet [sic] the definition of Total Disability" and that the benefits "were terminated on 07/01/2008, because our review of the medical records failed to support a Total Disability" (AR 102).  Defendant listed again the six jobs it found using the Dictionary of Occupational Titles, and described them as "a sample of various jobs that *your client shows transferable skills to perform*" (AR 103-04; emphasis added).  Defendant concluded, "In summary,

16

we find the medical documentation in Mr. Grabowski's claim file does not support that there are restrictions and limitations that would render your client unable to perform each of the main duties of any gainful occupation that your client has the training, education, and experience to perform" (AR 104).

## III.  Analysis

With due regard for the deferential standard of review for this ERISA claim, discussed above, we consider several factors in reviewing Lincoln's decision to terminate benefits, including the quantity and quality of the medical and vocational evidence, the opinions on both sides of the issues, Lincoln's decision-making process, and the conflict of interest inherent in Lincoln's role as insurer and Claims Administrator.

Plaintiff argues that Lincoln improperly terminated LTD benefits after approving his benefits for several years because Lincoln had no evidence of an improvement that would support its decision to make a change.  Plaintiff maintains that there was no improvement but instead, a worsening of Plaintiff's medical condition (Dkt 44, Pl. Br. in Supp. at 18-20).  Defendant counters that it need not show improvement but need only have a rational basis for concluding that Plaintiff was not disabled and could perform sedentary work.

When benefits are terminated, lack of evidence of an improvement is "a circumstance to be weighed by a reviewing court, rather than per se proof of arbitrariness."  *Morris v. Am. Elec. Power Long-Term Disability Plan*, 399 Fed. App'x 978, 984 (6th Cir. 2010).  The insurer must have a reason for the change, but new evidence need not necessarily show medical improvement.  *Id.* Instead, the reason may be based on evidence that better defines a claimant's medical condition or shows newly acquired skills.  *Id.*  The Court of Appeals for the Sixth Circuit explained: "We are not

17

suggesting that paying benefits operates forever as an estoppel so that an insurer can never change its mind; but unless information available to an insurer alters in some significant way, the previous payment of benefits is a circumstance that must weigh against the propriety of an insurer's decision to discontinue those payments." *McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586, 589 (6th Cir. 2002).

### A. Medical Evidence

While Plaintiff argues that he is impaired from doing any work in the sedentary category, there is substantial evidence in the record to support a finding that Plaintiff is capable of sedentary work with some limitations. This opinion is expressed in the two FCE reports and in several of the medical records provided by Dr. Dickinson, identified above. While evidence of Grabowski's deteriorating health suggests he may be categorized as incapable of any work in the future, the evidence in the record provides a reasonable basis for a conclusion that Plaintiff is capable of some sedentary work. The point of dispute with respect to Plaintiff's medical condition is whether Lincoln had sufficient evidence to reasonably determine that no restrictions or limitations needed to be placed on his capacity for sedentary work.

In making its determination to terminate benefits as of July 1, 2008, Lincoln relied on an internal medical review by Brandenburg, a registered nurse. Courts have expressed skepticism of a decision based on in-house review by a medical professional in the insurance company's employ. "[W]hen a plan administrator's explanation is based on the work of a doctor in its employ, we must view the explanation with some skepticism." *Moon*, 405 F.3d at 381-82. Here, the Lincoln employee referring the file for the medical review noted that he was referring the file "to see if clmt [(claimant)] has R[estrictions]/L[imitations] from Sedentary level (AR 3)" The admittedly limited

18

review responded to that question without expressly analyzing any specific evidence of restriction, concluding that "medical documentation does not appear to support R[estrictions]\L[imitation]s that would preclude work capacity in a sedentary occupation" (AR 19-20). Lincoln's review ignored rather than addressed Plaintiff's reports of constant pain and did not discuss his treating physician's assessment that Plaintiff's work capacity was restricted due to his impairments and pain level.

In its argument to this Court, Defendant does not cite Lincoln's internal medical review to justify its decision to terminate benefits, but instead argues that its decision weighed the medical evidence in the record and reasonably discounted Dr. Dickinson's "variable positions" and Plaintiff's "unreliable subjective complaints" (Dkt 47, Def. Mem. in Supp. at 2, 14, 19-22). Defendant asserts that its decision is supported by the opinions of two neurosurgeons, Dr. Carr, who performed the IME, and Dr. Fabi, who performed surgery on Grabowski in 2000 (Dkt 45, Def. Mot. ¶ 2(iii); Dkt 47, Def. Mem. in Supp. at 2, 14, 19-22).

Lincoln's repeated references to the opinion of Dr. Fabi rely on a document (AR 515) that is, on its face, questionable. Lincoln claims that Dr. Fabi signed this document on March 18, 2002, and checked "Class 4- . . . (sedentary)" (Dkt 49, Def. SMF ¶ 21). Although Plaintiff raised objections only to the relevance and not the authenticity of the document, it appears to be a modified copy of an earlier document. Except for the "x" at "Class 4" and the signature, the document dated March 18, 2002 (AR 515), appears identical to the first page of a two-page document completed and signed by Dr. Fabi more than a year earlier, on January 31, 2001 (AR 552-53). Moreover, the signature on the 2001 document (AR 553) does not resemble the signature of Dr. Fabi dated March 18, 2002 (AR 515). Defendant's repeated citations to this letter as evidence that Lincoln had reasons to terminate benefits is inconsistent with the absence of any reference to the document in question

19

in its termination of benefits letter.  In fact, in that letter, Lincoln identified the documentation from Dr. Fabi as notes "dated 6/14/200[0] to 04/19/2001" (AR 186), and made no reference to a record from Dr. Fabi dated March 18, 2002.  Even if the document could be fully credited, an opinion that Plaintiff was capable of sedentary work in 2002 does not reasonably support a 2008 decision to terminate benefits.

While Defendant provides some evidence of variations in Dr. Dickinson's opinions, its attack on his credibility is based on a selective, ahistorical reading of the documents and assumes that variations reflect bias rather than fluctuating pain levels.  Dr. Dickinson generally indicated that Grabowski was in constant pain but was capable of limited sedentary work.  The May 2005 assessment that Defendant highlights, in which Dr. Dickinson stated that Grabowski could never return to work, coincided with an office visit in which Grabowski reported extreme pain levels (AR 288)  Dr. Dickinson's later assessments again reflected contemporaneous reports (*e.g.,* 2006 assessment, AR 337).  In the reports submitted for Plaintiff's appeal, Dr. Dickinson reiterated that Plaintiff experienced constant pain that increased with activity and stated that he doubted Grabowski "will ever be able to get gainful employment in the future" (AR 153, 147, 145), but he did not opine that Plaintiff was unable to perform any sedentary occupation.

Defendant disingenuously describes *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003) as "acknowledging the well known propensity for treating physicians to act as disability advocates" (Dkt 47, Def. Mem. in Supp. at 22).  The *Nord* opinion does not disparage the opinions of treating physicians but, instead, explaining its holding that the Social Security disability program's presumption in favor of treating physicians did not apply in ERISA, the Court indicated that neither consulting and treating physicians's reports should be accorded routine deference.  538

U.S. at 832.  The Court noted that "if a consultant engaged by a plan may have an 'incentive' to make a finding of 'not disabled,' so a treating physician, in a close case, may favor a finding of 'disabled.'"  *Id.*

Dr. Carr's IME (AR 106-16) does not provide Defendant with new or substantial evidence for dismissing Plaintiff's treating physicians opinions regarding restrictions and limitations.  While discounting Plaintiff's pain level, the IME did not contribute new findings about Grabowski's medical condition.  After review of the medical records, Dr. Carr acknowledged that Plaintiff's physical impairment was serious but stated that he believed Plaintiff's subjective report of pain should be discounted (AR 114-15).  Dr. Carr did not measure or quantify Plaintiff's pain level and did not indicate whether he thought Plaintiff's reports were slightly or dramatically out of proportion to his underlying impairments.  Moreover, Dr. Carr gave an equivocal opinion regarding work restrictions, stating that no restrictions were necessary but including restrictions in his definition of sedentary work and acknowledging that Plaintiff "should provide his own personal restrictions to maintain comfort" (AR 114-15).

Defendant's determination to dismiss Plaintiff's claims of restrictions and limitations for work in the sedentary capacity and disregard the opinions of Plaintiff's treating physician, examined in light of the medical evidence as a whole, clearly lacks a reasonable basis.  Dr. Carr's equivocal opinions on limitations and his vague opinion that reports of pain should be discounted fail to state a case for dismissing the recommendations for range of movement restrictions and frequent position changes in Dr. Dickinson's reports.  Instead, the IME indicates that some restrictions would be appropriate.  Moreover, because neither the internal medical review nor the IME provided evidence that shows medical improvement or better defines Grabowski's medical conditions, the lack of

evidence of medical improvement must be considered as a factor to be weighed in determining whether Lincoln's decision was arbitrary and capricious.

## B. Other Evidence of Disability

Defendant relied on vocational as well as medical analysis to terminate benefits. In fact, Lincoln's decision to terminate benefits pivoted on the Transferable Skills Report (TSR) that it obtained in-house in May 2008 (AR 3). Lincoln appended the TSR to its June 4, 2008, termination of benefits letter and its appeal-rejection letter and described it to Plaintiff as containing a list of jobs that he showed transferable skills to perform (AR 187, 104).

Until Lincoln acted on the May 2008 TSR, it had defined Plaintiff as Totally Disabled (AR 102), even though it judged him capable of some sedentary work, on the grounds that he lacked sedentary skills and was "vocationally disabled" (AR 3-4). Two years earlier, Defendant had sent Grabowski's file for a TSR, which showed no occupations at sedentary that met the Plan requirements for gainful employment (AR 5). While the 2008 TSR yielded a different result, Lincoln cites no evidence of a change in Grabowski's skills or vocational ability to explain the change. Lincoln's correspondence with Plaintiff does not explain the change in TSR results and the Administrative Record contains limited evidence of the process by which the 2008 TSR was obtained. All it indicates is that the TSR used the Dictionary of Occupational Titles as a reference (AR 187) and Lincoln obtained the results within four business days (AR 3). There is no narrative report like the nurse's medical review in the internal record from either of the individuals who signed the TSR (AR 190) and no other indication that the TSR reviewers read Plaintiff's file or made any assessment of his skills, education, training or background.

22

The substantial vocational reports in the record, including the 2003 and 2005 FCE's, which focused on Plaintiff's functional abilities (AR 574-75, 339-48), and the 2005 vocational assessment, which focused on Plaintiff's vocational potential (AR 673-76), document in detail Plaintiff's skills, education, training and background.  This evidence cannot reasonably be construed to support Defendant's conclusion that Plaintiff had the skills needed to perform occupations that required computer skills, typing skills or the background for occupations requiring a clean police record.  The assessment of vocational potential completed at Defendant's request in 2005, found that Plaintiff had no transferable skills to sedentary work, did not use the computer and had received a D- grade in high school typing (AR 674-75).  It also noted that Plaintiff had a record of two misdemeanor counts of domestic violence (*id.*).  The 2003 FCE reported that his fine motor skills were classified as "not qualified" (AR 574).  In 2005, the FCE provided more detail on Plaintiff's manual dexterity, reporting that he scored below the first percentile on each of the Purdue Pegboard tests (AR 345).

Defendant provides no explanation for its conclusion that Plaintiff had sedentary skills and cites no evidence contrary to the 2003 and 2005 vocational assessments.  While Defendant was not required to perform another assessment of Plaintiff's vocational skills and potential, it had the right under the Plan to supplement its existing information on Plaintiff's vocational skills (AR 85). Lincoln did not seek to update its vocational studies but simply ignored them.  We must weigh the lack of evidence of newly acquired skills in assessing the propriety of Lincoln's decision to terminate benefits.  *McOsker*, 279 F.3d at 589; *Morris*, 399 Fed. App'x at 894.  Defendant's bald assertion in its termination letters that Plaintiff had the transferable skills for the jobs it identified and its failure to give any reasons why the vocational reports in the record were not considered in assessing the TSR list of occupations utterly fails to meet the requirement that a plan administrator

23

follow a deliberate, principled reasoning process and support its decision with substantial evidence. *See Glenn,* 461 F.3d at 666.

In its argument to this Court, Defendant maintains that Plaintiff could not rely on the evidence in the vocational assessments but was required to present new evidence on appeal (Dkt 47, Def. Mem. in Supp. at 23).  In light of the lack of evidence in the record showing that Plaintiff had gained transferable skills, Plaintiff's reliance on the record is reasonable.  Lincoln, moreover, misrepresents its own data to make its argument.  It asserts that Plaintiff's reliance on the lack of transferable sedentary skills is misplaced because at least some of the jobs listed in the TSR, including address-change clerk, are unskilled jobs, and Plaintiff had the burden to prove he lacked qualifications for such positions (*id.).*  The assertion that the vocational assessments in the record did not address requirements for a job like address-change clerk is directly contradicted by the source on which the TSR relied.  The Dictionary of Occupational Titles (DOT) identifies address-change clerk as a job that requires many clerical skills that Plaintiff lacks and shows no aptitude for acquiring.  The DOT provides:

> 203.582-066 TYPIST (clerical)
>
> Operates typewriter or computer to type and revise documents.  Compiles material to be typed.  Reads instructions accompanying material, or follows verbal instructions from supervisor or person requesting document, to determine format desired, number of copies needed, priority, and other requirements.  Types and revises material such as correspondence, reports, statistical tables, addresses, and forms, from rough draft, corrected copy, recorded voice dictation, or previous version displayed on screen, using typewriter or computer and word processing software.  May verify totals on report forms, requisitions, or bills.  May operate duplicating machine to reproduce copy.  May be designated according to material typed, as Address-Change Clerk (insurance); Endorsement Clerk (insurance); Policy Writer (insurance); Record Clerk (hotel & rest.); Statistical Typist (clerical). …

DICTIONARY OF OCCUPATIONAL TITLES, U.S. Dep't of Labor, Emp't & Training Admin. (Vol. I, 4th ed., rev. 1991).[4]  Defendant's failure to consider whether Plaintiff met the requirements for jobs it identified, added to its disregard of the evidence in its file that Plaintiff lacked transferable skills, is further proof that its decision to terminate benefits was arbitrary and capricious.

### C.  Conflict of Interest

Although Plaintiff did not present any direct evidence of conflict of interest, Defendant's decision-making process is highly indicative of a process aimed at denial of benefits rather than one directed by proper regard for the fiduciary duties owed to a claimant.  This is most evident in Lincoln's disregard of evidence at every turn, including its utilization of a limited in-house medical review, its disparagement of the opinions of Plaintiff's treating physician, its disregard of the evidence it had collected on Plaintiff's vocational skills, and its failure to analyze the job descriptions of occupations it claimed Plaintiff showed the skills, education, training and background to perform against its evidence of his actual abilities.  Lincoln's wholly inadequate review provides ample evidence that a conflict of interest "'arising from its dual role as administrator and insurer of the LTD policy interfered with an objective review of the record,'" *Hunter*, 2011 WL 2566357, at *8 (quoting *Evans v. UnumProvident Corp.*, 434 F.3d 866, 879 (6th Cir. 2006)).

### IV.  Conclusion

Reviewing the evidence and decision-making process as a whole and weighing the factors discussed above, we find that Lincoln did not engage in a deliberate and principled reasoning

---

[4]The DOT is available on the internet at Department of Labor, Office of Administrative Law Judges Law Library, DOT, but a caution is posted on the page that the DOT has not been revised since 1991. *See* http://www.oalj.dol.gov/libdot.htm.

process in making and supporting its decision to terminate benefits.  Defendant's approach did not reflect a reasoned consideration of Plaintiff's claim in terms of the Plan provisions, but instead reflected arbitrary decisions unsupported by substantial evidence.

Where an insurer's determination is arbitrary and capricious, the court may either award benefits or remand to the plan administrator.  *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 621 (6th Cir. 2006).  The court has broad discretion to craft a remedy.  *Id.* at 622.  Here, the record shows that Lincoln's decision to terminate benefits was made without evidence that Plaintiff's skill level or employment capacity had improved.  In light of the lack of a change in the evidence for the LTD determination that had afforded Plaintiff benefits prior to the cut-off date, we conclude that Grabowski remains entitled to his disability benefits and that they should be reinstated, with interest.

Accordingly, Plaintiff's Motion for Judgment on the Administrative Record (Dkt 43) is granted, and Defendant's Motion for Judgment on the Administrative Record (Dkt 45) is denied. Plaintiff may file an appropriate motion for attorney fees and costs.

An Order consistent with this Opinion will issue.


DATED:  August 11, 2011                            /s/ Janet T. Neff
                                                   JANET T. NEFF
                                                   United States District Judge

26